UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHILD A., by next friend PARENTS A,
CHILD B., by next friend PARENTS B,
CHILD C., by next friend PARENT C,
CHILD D., by next friend PARENTS D,

             Plaintiffs,           Judge Paul D. Borman
                               Magistrate Judge Michael J. Hluchaniuk
v                                No. 20-10363

SALINE AREA SCHOOLS, SCOT
GRADEN, STEVE LAATSCH,
DAVID RAFT, JOE PALKA,
THERESA STAGER, MOLLY GARCIA
and KIRK EVENSON,

             Defendants.

_____/

DAVID A. KALLMAN (P34200)        TIMOTHY J. MULLINS (P28021)
STEPHEN P. KALLMAN (P75622)     JOHN L. MILLER (P71913)
KALLMAN LEGAL GROUP, PLLC     GIARMARCO, MULLINS & HORTON, P.C.
*Attorney for PlaintiffS*            *Attorneys for Defendants*
5600 W. Mount Hope Hwy.         101 W. Big Beaver Road, 10th Floor
Lansing, MI 48917                Troy, MI 48084-5280
(517) 322-3207                   (248) 457-7020
dave@kallmanlegal.com            tmullins@gmhlaw.com
                                   jmiller@gmhlaw.com

# RESPONSE TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER

# ISSUE STATEMENT

**ISSUE:** *Tinker* allows schools to discipline students for their conduct "<u>in class or out of it</u>, which for any reason . . . materially disrupts classwork or **<u>involves substantial disorder or invasion of the rights of others.</u>**" *Tinker v. Des Moines Indep. Cmty. Sch. Dist.,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969)(emphasis added). Plaintiffs are four Caucasian students/football players at Saline High School. On a Sunday evening, they created a "group chat" and invited African American teammates to join. Plaintiffs then proceeded to call their African American peers "niggers." Once they succeeded in causing most of the African American students to leave the group chat, they continued to post that they won the "race war" and cheered "white power." Not surprisingly, many of these messages were published to the entire student community. The School District was inundated with complaints. African American students reported their fear attending class and difficulty focusing on schoolwork. Given the above, did the School District violate Plaintiffs' First Amendment rights by addressing their off-campus speech that (1) created a hostile environment for other students and (2) caused a substantial disruption on-campus?

## STATEMENT OF MOST CONTROLLING AUTHORITY

- ***Tinker v. Des Moines Indep. Cmty. Sch. Dist.,*** 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969)(allowing a student's personal, non-school-sponsored expression to be restricted where the conduct, "in class **or out** of it, which for any reason—whether it stems from time, place, or type of behavior—materially disrupts classwork or **involves substantial disorder or invasion of the rights of others**.")

- ***Bethel Sch. Dist. No. 403 v. Fraser***, 478 U.S. 675, 682 (1986)(holding a school may restrict vulgar or offensive speech in furtherance of its mission to "inculcate the habits and manners of civility," and to "teach[] students the boundaries of socially appropriate behavior."")

- **42 U.S.C. § 2000d** and its interpreting case law (requiring school districts to respond to peer-on-peer racial harassment).

# TABLE OF CONTENTS

ISSUE STATEMENT .......................................................................... ii

STATEMENT OF MOST CONTROLLING AUTHORITY ............................ iii

INDEX OF AUTHORITIES ............................................................... vi

INTRODUCTION ...........................................................................1

FACTS ......................................................................................4

    1.    Plaintiff's Created a Racial Hostile Environment That
        Created a Substantial Disruption On-Campus ..................................4

    2.    The Resulting Discipline ...................................................9

    3.    Federal Law, State Law, and School District Policy Required
        the School District to Take Remedial Action in Response
        to Racial Harassment .....................................................10

LEGAL ARGUMENT ........................................................................12

    1.    Standard for Granting Preliminary Injunctive Relief......................12

    2.    Plaintiffs Are Not Likely to Succeed on the Merits........................14

        A.    The School District May Regulate Plaintiffs'
            Off-Campus Speech ..............................................14

        B.    The School District's Content-Based Restriction
            Is Constitutional .................................................21

        C.    The School District's Policies Comply With The
            Matt Epling Safe School Law ...................................23

D. The School District's Policies Are Not Unconstitutionally Vague or Overbroad................................................................23

3. Plaintiffs Will Not Suffer Irreparable Harm ....................................26

   A. Plaintiffs A and B Will Not Suffer Irreparable Harm...........27

   B. Plaintiffs C and D Will Not Suffer Irreparable Harm...........28

4. An Injunction Would Irreparably Harm the School District and its Students; it Would also Violate Public Policy ...................29

CONCLUSION ......................................................................................32

## INDEX OF AUTHORITIES

*Basicomputer Corp. v. Scott*, 973 F.2d 507 (6th Cir. 1992) .......................... 26,27

*Bell v. Itawamba County School Bd.*, 799 F.3d 379 (5th Cir. 2015) .......... 2,17,18

*Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675 (1986) ............................. iii,14

*Bonnell v. Lorenzo*, 241 F.3d 800, 826 (6th Cir. 2001) ....................................... 12

*CLT Logistics v. River West Brands,* 777 F.Supp.2d 1052
(E.D. Mich. 2011) ................................................................................................. 13

*D.J.M, ex rel. D.M. v. Hannibal Pub. Sch. Dist. No. 60,* 647 F.3d 754
(8th Cir. 2011) ...................................................................................................... 17

*DeJohn v. Temple Univ.*, 537 F.3d 301 (3rd Cir. 2008) .................................... 30

*Doninger v. Niehoff*, 514 F. Supp. 2d 199 (D. Conn. 2007),
aff'd 527 F.3d 41 (2nd Cir. 2008) ........................................................ 2,15,17,27

*Endrew F ex rel Joseph F v Douglas Co Sch Dist RE-1*, 137 S Ct 988;
197 L Ed 2d 335 (2017) ....................................................................................... 31

*Forest City Daly Housing, Inc., v. Town of N. Hempstead*, 175 F.3d 144
(2nd Cir. 1999) ..................................................................................................... 26

*Gonzales v. Nat'l Bd. Of Med. Exam'rs.,* 225 F.3d 620 (6th Cir. 2000) ....... 13,14

*Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988) ................................. 14

*Hohe v Casey*, 868 F.2d 69 (3rd Cir.), cert. denied, 493 U.S. 848 (1989) .......... 26

*In re DeLorean Motor Co.,* 755 F.2d 1223 (6th Cir. 1985) ................................. 14

*J.S. ex rel Snyder v. Blue Mountain Sch. Dist.*, 650 F.3d 915
(3rd Cir. 2011)............................................................................... 2,16,17

*Kowalski v. Berkeley Cty. Schs.*, 642 F.3d 565 (4th Cir. 2011)............. 2,16,18,30

*Longoria Nest Friend of M.L. v. San Benito Independent
Consolidated School District*, 942 F.3d 258 (5th Cir. 2019)...............................18

*Lowery v. Euverard*, 497 F3d 584 (6th Cir 2007) ........................ 5,15,16,29,30,31

*Mason County Med. Ass'n v. Knebel*, 563 F.2d 256
(6th Cir. 1977)....................................................................................13

*McNeil v. Sherwood School District 88J*, 918 F.3d 700 (9th Cir. 2019)..........2,16

*Michigan State AFL-CIO v. Miller*, 103 F.3d 1240 (6th Cir. 1997) ..................14

*Modern Computer Sys., Inc. v. Modern Banking Sys., Inc.*, 897 F.2d 734
(8th Cir. 1989)....................................................................................26

*Morse v. Frederick*, 551 US. 393 (2007) .................................................. 14,15,16

*New Jersey v. T.L.O.*, 469 U.S. 325 (1985) ................................................. 30,31

*Northeast Ohio Coal. For Homeless & Serv. Employees Int'l Union,
Local 1199 v. Blackwell*, 467 F.3d 999 (6th Cir. 2006)........................................13

*Olu-Cole v. E.L. Haynes Public Charter School*, 292 F. Supp. 3d 413
(D.D.C. 2018), *rev'd on other grounds*, 930 F.3d 519 (C.A.D.C. 2019) ..........27

*Ottaviano ex. Rel Ottaviano v. Kings Park Cent. School Dist.*,
__F. Supp. 2d __, 2010 WL 5437220, (E.D.N.Y. Dec. 23, 2010) .....................27

*Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566
(6th Cir. 2002).....................................................................................13

*S.B. ex rel. Brown v. Ballard County Bd. of Educ.*, 780 F. Supp. 2d 560
(W.D. Ky. 2011) ..................................................................................29

*S.J.W. ex rel. Wilson v. Lee's Summit R-7 School Dist.*, 696 F.3d 771
(8th Cir. 2012) .............................................................................. 19,27

*Sandison v. Mich. High Sch. Athletic Ass'n, Inc.*, 64 F.3d 1026
(6th Cir. 1995) ..................................................................................13

*Taylor v. Corinth Public School Distric*t, 917 F. Supp. 464
(N.D. Miss. 1996) ..............................................................................28

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.,* 393 U.S. 503, 89 S.Ct. 733,
21 L.Ed.2d 731 (1969) .............................ii,iii,2,3,12,14,15,16,17,20,21,25,30,31

*UASCO Coal Co. v. Carbomin Energy, Inc.*, 689 F.2d 94 (6th Cir. 1982) .........13

*Winter v. Natural Res. Def. Council,* 505 U.S. 7 (2008) ....................................13

*Wisniewski v. Bd. of Ed. of Weedsport Cen. Sch. Dist.*, 494 F.3d 34
(2nd Cir. 2007) ................................................................................2,17

*Wynar v. Douglas County School District*, 728 F.3d 1062
(9th Cir. 2013) .............................................................................. 2,16,18

*Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 664 (2d Cir.2012) .............10

## **Statutes**

34 C.F.R. § 100.13(i) (2000)...............................................................10

42 U.S.C. § 2000d ......................................................................... iii,10

42 U.S.C. § 2000d–4a(2)(B) ...............................................................11

MCL 37.2102, .2301(a), .2401-.2402 ..............................................11

MCL 380.1210b(5)(a) .......................................................................... 11,12,23,25

MCL 380.1310b(10)(c) .......................................................................... 10,11,23

## INTRODUCTION

Utilizing pseudonyms to hide their identity,[1] Plaintiffs argue that they have a constitutional right to call their African American classmates "niggers." They also assert that the following speech is constitutionally protected:

- "A nigger is a black person, but a black person isn't always a nigger."

- "Can you like stop being black?"

- Plaintiffs' racist remarks caused several offended African American students to leave the group chat. In response, Plaintiffs sent the following messages: "Victory Lap. White Power. The South will Rise Again. Amen."

Attempting to minimize their misconduct, Plaintiffs characterize the above speech as **"immature banter."** (Motion for TRO at Pg ID 63).

What Plaintiffs dismiss as "immature banter" is more accurately characterized as overt racism or hate speech. More importantly, it had the foreseeable consequence of creating a hostile environment for African American students, who reported that they were afraid to attend school and were distracted from their schoolwork. The

---

[1] Attempting to convey innocence, Plaintiffs' Motion refers to themselves as "Child A," "Child B," "Child C," and "Child D." They are not children in the colloquial sense. All four Plaintiffs are high school students and athletes. If Plaintiffs believe they have a constitutional right to call their African American peers racial slurs, they should not hide beneath a white robe of anonymity.

above hate speech caused a substantial disruption on-campus that is still being felt today.[2]

Plaintiffs' Motion argues for a black-and-white world that does not exist, where on-campus speech can be regulated but off-campus speech cannot. Nearly every Circuit to address this issue has disagreed with Plaintiffs' position.[3] Courts have rejected this simplistic worldview because bullying and harassment are no longer relegated to the hallway and schoolyard. Rather, they now occur in the cyberworld—with social media and technology continually evolving. The introduction of these technologies, and their ubiquitous use amongst students, has created new and evolving challenges for school administrators. Off-campus threats, harassment, and intimidation directed at students creates a tension between a

---

[2] Some of this disruption has been the focus of ongoing media coverage. There have been dozens of complaints from staff, students, and community members. *See, e.g.,* https://www.mlive.com/news/ann-arbor/2020/02/video-by-saline-students-says-racists-hate-outnumbered.html;

https://www.mlive.com/news/ann-arbor/2020/02/saline-students-stand-lock-arms-to-protest-school-leaders-response-to-racism.html.

[3] *Tinker v. Des Moines Indep. Cmty. Sch. Dist.,* 393 U.S. 503, 514, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), allows infringing otherwise-protected speech when facts "le[a]d school authorities to forecast substantial disruption of or material interference with school activities." The following Circuits have held that *Tinker* applies to off-campus speech. *See, e.g., Wynar v. Douglas County School District,* 728 F.3d 1062 (9th Cir. 2013); *Kowalski v. Berkeley Cty. Schs.*, 642 F.3d 565, 573 (4th Cir. 2011); *McNeil v. Sherwood School District 88J,* 918 F.3d 700, 707 (9th Cir. 2019); *J.S. ex rel Snyder v. Blue Mountain Sch. Dist.*, 650 F.3d 915 (3rd Cir. 2011); *Doninger v. Niehoff,* 527 F.3d 41, 48 (2nd Cir. 2008); *Wisniewski v. Bd of Educ. Of Weedsport Cent. Sch. Dist.*, 494 F.3d 34, 38-39 (2nd Cir. 2007); *Bell v. Itawamba County School Bd.*, 799 F.3d 379, 382-94 (5th Cir. 2015).

student's free-speech rights and a school district's duty to maintain discipline, remedy peer-on-peer harassment under Title VI and Title IX, and to protect the school community.

Because of the above tension, Courts have deferred to school administrators to regulate off-campus speech that has the potential to: (1) harm other students; or (2) cause a substantial disruption on-campus. Otherwise, if Plaintiffs were correct, they could line-up before school on adjacent property, hold up signs calling minority students degrading names, and tell them to "go back where they came from."[4] Plaintiffs' argument would essentially allow de facto segregation to go unchecked— as long as the force, intimidation, and harassment occurred five minutes before school while standing on a public sidewalk.

Plaintiffs' Motion for a TRO/Preliminary Injunction should be denied because Plaintiffs cannot satisfy any of the necessary elements.

First, they are unlikely to prevail on the merits. Most Circuits have held that school districts can discipline students for off-campus speech if the *Tinker* requirements are met. Thus, a school district may discipline students for off-campus

---

[4] This isn't an academic exercise. At a recent school board meeting, one parent scolded a minority parent with the question **"why didn't you stay in Mexico?"** *See https://www.mlive.com/news/ann-arbor/2020/02/why-didnt-you-stay-in-mexico-school-diversity-and-inclusion-meeting-turns-volatile.html*

speech if it: (1) causes a material interference or (2) there was a reasonable forecast of substantial disruption.

Second, there is no irreparable harm. Despite representations to the contrary, all four Plaintiffs are currently completing their coursework and are on track to graduate on time. Plaintiffs A and B will be allowed to resume extracurriculars on March 9, 2020. Plaintiffs C and D's suspensions end on March 6, 2020. Any other harm, to the extent Plaintiffs were to prevail, can be remedied by a monetary judgment.

Third, the harm to the School District and the community would be substantial if this Court granted a TRO/Preliminary Injunction. Federal laws—such as Title VI and Title IX—require school districts to remedy hostile educational environments. Other students have the right to attend school and feel safe. If a school district loses its ability to discipline overtly racist misconduct, the ability to provide a safe environment for students to learn will be substantially eroded. That is untenable.

## FACTS

1.  **PLAINTIFF'S CREATED A RACIAL HOSTILE ENVIRONMENT THAT CREATED A SUBSTANTIAL DISRUPTION ON-CAMPUS**

On Sunday, January 26, 2020, two students, "N", a Caucasian student, and "E," an African American student, were messaging each other using the social media

application, Snapchat.[5] At one point, student "N" used the word "nigger." Student "E" objected and told "N" that he should not use that word. Other students were added to the conversation,[6] and the situation deteriorated.[7] Most students who were added to the group message left upon reading the racial slurs and divisive language. The Plaintiffs in the action were active participants in the conversation and were responsible for the following hate speech:

- Plaintiff A posted a picture of an African American man wearing a sailor's hat with the words "salutations nigger"; asked whether his race "won."

- Plaintiff B changed the name of the group to "Racist" and included two gorilla emojis.

- Plaintiff C called African American students in the group "niggers" and made other posts using the word "nigger." He also made racially derogatory

---

[5] By the nature of the Snapchat Application, many of the messages were automatically deleted upon being read. *See*  https://support.snapchat.com/en-US/a/group-chat.

[6] All students participating in this conversation were members of the Football team, and as such are representatives of the School District. This distinction is important because the Sixth Circuit has explained that schools have an even greater ability to restrict speech relative to student athletes. *Lowery v. Euverard*, 497 F3d 584, 596-598 (6th Cir 2007)("[S]tudent athletes have greater similarities to government employees than the general student body…. [In both situations the issue is not] fundamentally about the right to express one's opinion, but rather the ability of the government to set restrictions on voluntary programs it administers.").

[7] In order to create a group on snapchat, members need to select those individuals from their "Friends" and affirmatively add them. *See* https://support.snapchat.com/en-US/a/group-chat . This is important because it evidences that the speech at issue was intentionally directed at members of the school community. This was further corroborated through witness statements. (**Exhibit A**).

5

statements, such as "white power" and "the South will rise again"; and mocked a student with a speech related disability.

- Plaintiff D called African American students in the group "niggers" and made other posts using the word "nigger." He also made racially derogatory statements, such as "white power" and "the South will rise again"; and mocked a student with a speech related disability.

An African American Student, "K," made a video recording of some messages the students posted. He then uploaded the video to social media. Below are some of the screenshots provided to the School District. *See also* (**Exhibit B**.)



The next day, Monday, January 27, 2020, the School District began receiving phone calls from families with concerns for student safety. (**Exhibit C: Declaration of Superintendent Graden**). The video recording was being shared throughout the school, and students were openly discussing the posts during passing time, in the cafeteria, and in the classroom. **Many African American students reported feeling anxious and uncomfortable at the high school and expressed fear going to class**. (*Id*).

Upon learning of the social media post, the District began an investigation to determine whether Board Policy or the Student Code of Conduct had been violated; this included reviewing the Snapchat post and interviewing the students involved. (*Id*). The District obtained outside legal counsel to assist in this investigation. (*Id*).

On Tuesday, January 28, 2020, the District held its regular Board of Education meeting. Students and staff filled the room waiting to express the impact of the comments on the educational environment. (*Id*). **Students reported that they did not feel safe in the school building as a result of the tension created by the Snapchat messages**.[8] (*Id*). These students asked the Board of Education to take action to rectify the school environment. (*Id*). Over the course of the next week, the school was inundated with contacts and concerns by members of the school community. For example, on February 3rd, the Superintendent's Community Conversation was filled with parents to discuss what the Diversity and Inclusion committee was doing to remedy racial harassment in the District. (*Id*). On February 5, more than 200 people gathered to protest racial harassment; this included students and staff. (*Id*). *See* **Exhibit J** for a small sample of communications evidencing the

---

[8]     For      example,      *see*      *https://www.youtube.com/watch?v=hAER-EaP2zA*, https://www.youtube.com/watch?v=7W2acGm5i1U,      https://www.teenvogue.com/story/saline-high-school-students-demanding-racial-justice-racist-snapchat-incident, https://www.washingtonpost.com/video/national/why-didnt-you-stay-in-mexico-heated-debate-erupts-at-michigan-school-meeting-on-racism/2020/02/04/609e7db7-3a41-4bf1-94d1-b01ca13bf238_video.html.

substantial disruption, which (1) includes African America students reporting difficulty attending class; (2) threats of fights at schools, and (3) even threats of people being shot. The student body performed a "walk out" protest over this incident. *Id.*

On January 29 and 30, multiple African American students at Saline High School filed formal complaints of race-based harassment in violation of Title VI of the Civil Rights Act with the District. (*Id*). These students had been added into the group chat and were among the recipients of overtly racist slurs. (*Id*). The outcome of this investigation is attached as **Exhibit D**. In short, the District determined that Plaintiffs had violated Board Policy. (*See* **Exhibit E: Anti-Harassment Policy, Exhibit F: Bullying Policy, Exhibit G: Non-Discrimination Policy, Exhibit H: Student Handbook**).

## 2.   THE RESULTING DISCIPLINE

To show irreparable harm, Plaintiffs suggest that two Plaintiffs are "suspended from all school activities." (Motion for TRO at Pg ID 6.) This is not true. First, Plaintiffs A and B returned to school. (Pls. Compl. PgID 10). A and B may resume extracurricular activities on Monday, March 9, 2020. Additionally, the District is working with Students A and B regarding any issues with the SAT.

Likewise, Students C and D will only remain suspended until the end of the current trimester or until March 6, 2020; however, they are still be allowed to

complete their coursework and take final examinations, so there will be no negative consequence towards graduating high school. Beginning on March 9, 2020, C and D will finish the remainder of the school year in an alternative educational setting, which will include one-on-one academic support. (**Exhibit I**). Students C and D do not face expulsion and will be allowed to resume extracurricular activities at the end of the 2019-2020 academic year.

3.   **FEDERAL LAW, STATE LAW, AND SCHOOL DISTRICT POLICY REQUIRED THE SCHOOL DISTRICT TO TAKE REMEDIAL ACTION IN RESPONSE TO RACIAL HARASSMENT**

Various laws affirmatively require school districts to prevent and respond to harassment. The failure to do so can result in the loss of federal funding or the imposition of civil liability.

Title VI provides that "[n]o person in the United States shall, on the ground of race...be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Public education entities such as the School District are subject to this mandate. *See Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 664 (2d Cir.2012) (citing 34 C.F.R. § 100.13(i) (2000)) (defining "recipient" to include any public "agency, institution, or organization, or other entity...in any State, to whom Federal financial assistance is extended."). A "program or activity" under Title VI includes "a local educational agency..., system of vocational education, or

10

other school system." 42 U.S.C. § 2000d–4a(2)(B). Deliberate indifference to student-on-student harassment is actionable under Title VI.

Michigan has also adopted a statute known as the Elliot Larsen Civil Rights Act, which expressly applies to educational institutions. *See* MCL 37.2102, .2301(a), .2401-.2402. Under this Statute, a school district can be liable for racial harassment.

Michigan law requires school districts to implement an anti-harassment policy that includes cyberbullying as a form of bullying. *See* MCL 380.1210b(5)(a). The Michigan anti-bullying laws codified cyberbullying into its definition of "bullying" when such cyberbullying substantially interferes with educational opportunities, benefits, or programs of one or more students. *See* MCL 380.1310b(10)(c); *see* MCL 380.1210b(5)(a).

The School District's Policies and Student Code of Conduct prohibit harassment based on race (as well as other protected classifications. (**Exhibit E, Exhibit G, Exhibit H**).

Germane to the issue before the Court, Board Policy 5517.01 addresses cyberbullying or off-campus harassment. (*See* **Exhibit F**). Board Policy 5517.01 protects students from bullying and other aggressive behavior, including harassment. (*See Id*). This policy applies to conduct that occurs at school and outside of school if it interferes with the school environment. (*Id*). Bullying, including cyberbullying, is a written, verbal, or physical act, that is

intended or that a reasonable person would know is likely to harm one
( 1) or more students either directly or indirect by doing any of the
following: (A.) Substantially interfering with educational
opportunities, benefits, or programs of one ( 1) or more students; (B.)
Adversely affecting the ability of a student to participate in or benefit
from the school district's educational programs or activities by placing
the student in reasonable fear of physical harm or by causing substantial
emotional distress; (C.) Having an actual substantial detrimental effect
on a student's physical or mental health; and/or (D.) *Causing
substantial disruption in, or substantial interference with the orderly
operation of the school.* [Emphasis added].

(*Id*). This Policy is modeled directly from the Supreme Court's holding in *Tinker*

and complies with the requirements in MCL 380.1210b(5)(a). *See Tinker v. Des*

*Moines Indep. Cmty. Sch. Dist.,* 393 U.S. 503, 514, 89 S.Ct. 733, 21 L.Ed.2d 731

(1969). Both *Tinker* and MCL 380.1210b(5)(a), authorize the School District to

regulate off-campus speech in these precise circumstances.

## LEGAL ARGUMENT

### 1.  STANDARD FOR GRANTING PRELIMINARY INJUNCTIVE RELIEF

It is well settled in this Circuit that "[a] preliminary injunction is reserved for

only the most egregious case, and should not be extended to cases which are doubtful

or do not come within well-established principles of law."[9] *Bonnell v. Lorenzo*, 241

F.3d 800, 826 (6th Cir. 2001). The moving party has the "burden of proving that the

---

[9] Despite this established legal standard, Plaintiffs' legal argument begins with the realization that
it "is an open question" the extent schools can discipline off-campus speech. (Motion for TRO:
DE# 5, Pg ID 68).

circumstances clearly demand [an injunction]." *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).

The same standard generally applies to the issuance of temporary restraining orders (TROs) and preliminary injunctions. *Northeast Ohio Coal. For Homeless & Serv. Employees Int'l Union, Local 1199 v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006). A preliminary injunction or TRO is based on the following factors:

(1) whether the movant has shown a strong or substantial likelihood or probability of success on the merits;

(2) whether the movant has shown that he or she would suffer irreparable harm if the preliminary relief is not issued;

(3) whether the issuance of a preliminary injunction will not cause substantial harm to third parties; and

(4) whether the public interest would be served by the issuance of a preliminary injunction.

*Sandison v. Mich. High Sch. Athletic Ass'n, Inc.*, 64 F.3d 1026, 1030 (6th Cir. 1995); *UASCO Coal Co. v. Carbomin Energy, Inc.*, 689 F.2d 94, 98 (6th Cir. 1982); *Mason County Med. Ass'n v. Knebel*, 563 F.2d 256, 261 (6th Cir. 1977).

Although the factors are to be balanced, a finding that there is no strong likelihood of success on the merits, *Gonzales v. Nat'l Bd. Of Med. Exam'rs.,* 225 F.3d 620, 625 (6th Cir. 2000), or no strong likelihood of irreparable harm, *Winter v. Natural Res. Def. Council,* 505 U.S. 7, 129 (2008), is usually fatal to a motion for injunctive relief. *See CLT Logistics v. River West Brands,* 777 F.Supp.2d 1052, 1064

13

(E.D. Mich. 2011). A district court need not address all the preliminary injunction factors when fewer are dispositive of the issue. *Id.* (citing *In re DeLorean Motor Co.,* 755 F.2d 1223, 1229 (6th Cir. 1985)).

**2.    PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS**

A finding that there is no likelihood of success on the merits is fatal to a preliminary injunction. *Gonzales v. National Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000); *Michigan State AFL-CIO v. Miller*, 103 F.3d 1240, 1249 (6th Cir. 1997)(reversing preliminary injunction because there was no likelihood of success on the merits.)). Here, Plaintiffs are unable to succeed on the merits for the reasons stated below.

**A.    The School District May Regulate Plaintiffs' Off-Campus Speech**

The constitutional rights of students in a public school are not automatically coextensive with the rights of adults in other settings, and the rights of students must be applied in light of the special characteristics of the school environment. ***Morse v. Frederick***, 551 US. 393, 396–97 (2007) (quoting ***Bethel Sch. Dist. No. 403 v. Fraser***, 478 U.S. 675, 682 (1986)); ***Hazelwood Sch. Dist. v. Kuhlmeier***, 484 U.S. 260, 266 (1988) (quoting ***Tinker***, 393 U.S. at 506)) (citations omitted)).

14

The Court has recognized many circumstances when schools may regulate student speech. First, a school may restrict speech if it "materially and substantially disrupt[s] the work and discipline of the school." *Tinker, 393 U.S. at 513*. Second, a school may restrict vulgar or offensive speech in furtherance of its mission to "inculcate the habits and manners of civility," and to "teach[] students the boundaries of socially appropriate behavior" *Fraser*, 478 U.S. at 681, 683, 685. Third, "expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school" may be regulated "so long as [the school's] actions are reasonably related to legitimate pedagogical concerns." *Kuhlmeier*, 484 U.S. at 271, 273. Finally, speech advocating illegal drug use, or the "threat to the physical safety of students" may be punished. *Morse v. Frederick*, 551 U.S. 393, 424–25 (2007) (Alito, J., concurring).

This case primarily[10] involves the application of *Tinker*, which again allows a school to regulate a student conduct "in class or out of it, which for any-reason—

---

[10] Chief Justice Roberts noted that "*Fraser* established that the *mode of analysis* set forth in *Tinker* is not absolute." *Morse*, 551 U.S. at 405 (emphasis added). The holdings, separate analysis, and reasoning from the other school-speech cases can thus inform the Court's analysis, even if utilized in the *Tinker* test. *See Id.*; *see also Lowery*, 497 F.3d at 588–90; *Doninger*, 527 F.3d at 51–53. In

whether it stems from time, place, or type of behavior—materially disrupts classwork or **involves substantial disorder or invasion of the rights of others.**" *Tinker*, 393 U.S. at 513. While "undifferentiated fear or apprehension of disturbance" or a "mere desire to avoid discomfort and unpleasantness" is "not enough to overcome the right to freedom of expression," *Id.* at 337–38, "*Tinker* does not require certainty that disruption will occur," and "only that the forecast of substantial disruption be reasonable." *Lowery*, 497 F.3d at 584 (citations and quotations omitted).

While neither the Supreme Court nor the Sixth Circuit have spoken on the precise issue presented here, **five Circuits have held that that the school district may discipline students for off-campus speech when the *Tinker* requirements are met**. *See, e.g.*, *Wynar v. Douglas County School District*, 728 F.3d 1062 (9th Cir. 2013); *Kowalski v. Berkeley Cty. Schs.*, 642 F.3d 565, 573 (4th Cir. 2011); *McNeil v. Sherwood School District 88J*, 918 F.3d 700, 707 (9th Cir. 2019); *J.S. ex*

---

this regard, it should be noted that the "speech" at issue here—overtly racist slurs and insults—is far more vulgar and offensive as that spoken in *Fraser*. It was certainly not a commentary on an important public issue of the day, striking "the heart of the First Amendment …." *Morse*, 551 U.S. at 403; *C.f.* *Tinker*, 393 U.S. at 504. It is not even a factual report of important events happening at the school. It is thus subject to lesser protection than the "nondisruptive, passive expression of a political viewpoint in *Tinker*." *Fraser*, 478 U.S. at 680.

*rel Snyder v. Blue Mountain Sch. Dist.*, 650 F.3d 915 (3rd Cir. 2011); *Doninger v. Niehoff*, 527 F.3d 41, 48 (2nd Cir. 2008); *Wisniewski v. Bd of Educ. Of Weedsport Cent. Sch. Dist.*, 494 F.3d 34, 38-39 (2nd Cir. 2007); *Bell v. Itawamba County School Bd.*, 799 F.3d 379, 382-94 (5th Cir. 2015).

Numerous other courts have held that a school district may discipline students for cyberbullying that takes place on social media if the requirements of *Tinker* are met. For example:

- *Wisniewski v. Bd. of Ed. of Weedsport Cen. Sch. Dist.*, 494 F.3d 34 (2nd Cir. 2007)(holding that under *Tinker*, it was reasonably foreseeable that a student's speech would cause substantial disruption to the school where a student's internet message suggested that a teacher would be killed, even after the police investigator and psychologist concluded that the student's speech was intended as a joke));

- *Doninger v. Niehoff*, 527 F.3d 41, 50 (2nd Cir. 2008)(holding that the school could discipline a student for her off-campus blogpost that contained vulgarities.));

- *D.J.M, ex rel. D.M. v. Hannibal Pub. Sch. Dist. No. 60,* 647 F.3d 754, 756-57 (8th Cir. 2011)(holding that the school may suspend a student for his instant messages threatening to get a gun and shoot students at

17

his school even though those messages were sent from home and to a friend.));

- *Kowalski v. Berkeley County Schools,* 642 F.3d 565, 567, 573 (4th Cir. 2011)(holding that the school could discipline the student for creating and posting on a webpage that ridiculed a classmate <u>because targeting a student creates a sufficient nexus between the speech and the school environment to implicate the school district's authority to discipline the off-campus speech</u>.));

- *Wynar v. Douglas County School District*, 728 F.3d 1069 (9th Cir. 2013)(holding that school could discipline a student for MySpace messaging.));

- *Bell v. Itawamba County School Bd.*, 799 F.3d 379, 382-92 (5th Cir. 2015)(holding that the school could discipline a student for his racist YouTube video because it would foreseeably create a substantial disruption.));

- *Longoria Nest Friend of M.L. v. San Benito Independent Consolidated School District*, 942 F.3d 258 (5th Cir. 2019)(the school employees were entitled to qualified immunity for removing a high school cheerleader from the team based on her social media.));.

18

- *R.L. v. Central York School District*, 183 F. Supp. 3d 625, 640 (M.D. Penn. 2016)(holding that student's suspension for off-campus Facebook post did not violate his First Amendment because the post created a foreseeable risk of disruption at the school.));

- *A.N. by and through Niziolek v. Upper Perkiomen School*, 228 F.Supp. 3d 391, 400-401 (E.D. Penn. 2017)(holding that the school could discipline the student for her threatening Instagram post because the perceived threat against a student created a reasonable forecast of disruption.));

- *Johnson v. Cache County School District,* 323 F. Supp. 3d 1301, 1314 (D. Utah 2018)(holding that the school may dismiss the student from the cheerleading squad for posting that she made the team on SnapChat in violation of the squad rules.));

- *McKinney as Nest Friend of K.P. v. Hutsville School District*, 350 F. Supp. 3d 757, 766 (W.D. Ark. 2018)(holding that that the school may suspend the student for his social media post showing him in a trench coat and holding an automatic rifle because the post caused a substantial disruption; denying the student's request for a preliminary injunction.)).

In a factually similar case, *S.J.W. ex rel. Wilson v. Lee's Summit R-7 School Dist.*, 696 F.3d 771 (8th Cir. 2012), the Eight Circuit reversed the district court's

19

grant of a preliminary injunction because the student was unlikely to succeed on the merits. In *Wilson*, a student created a website that contained a blog. *Id.* at 773. The purpose of the blog was to discuss, satirize, and vent about his school. *Id.* The student used a special domain to create the website to prevent U.S. users from finding the site through a google search; however, any U.S. user could access the site if they knew the address. *Id.* A few days after creating the site, the student added a post that contained a variety of offensive and racist comments about classmates. *Id.* The post also mocked black students. *Id.* The student initially informed five or six school friends about his site. *Id.* However, within days the word spread quickly about the racist posts and the student body at large discovered the website. *Id.* After receiving student and faculty reports regarding the website, the school quickly linked the student to the site and suspended him for ten days. *Id.*

The student filed suit alleging that the school violated his First Amendment rights and moved for a preliminary injunction to lift his suspension. *Id.* at 774. The district court granted the preliminary injunction finding that the student had a fair chance of success on the merits. *Id.* The school appealed arguing that the district court failed to make an appropriate finding based on the student's likelihood of success. *Id.* The Eighth Circuit agreed, holding the student was unlikely to succeed on the merits of his claim. *Id.* at 777. The Eighth Circuit concluded that the school could suspend the student for his off-campus speech under *Tinker* because the speech

caused a substantial disruption. *Id.* The Eighth Circuit reasoned that the student targeted the school community and the speech did in fact cause a substantial disruption. *Id.* at 778.

Here, as in *Wilson*, the School District's regulation of Plaintiffs' speech was permissible under *Tinker*. There is no question that Plaintiffs intentionally directed the racist messages at the school community. (**Exhibit A, Exhibit B, Exhibit C**). More importantly, there is overwhelming evidence of a substantial disruption. One could only look at the national coverage of this incident and find that it caused substantial disruption at school. The disruption has been significant enough that it appeared on CNN, the Washington Post, and other national broadcasts/publications. African American students have reported fear attending schools, there has been threats of violence, and even the mention of "rats" being shot. *See* **Exhibit J**.

Considering the above case law, Plaintiffs' suggestion that the law "is clear that schools lack the authority" to punish off-campus speech is odd. (Motion for TRO at Pg ID 60.) If anything, the law seems clear that Plaintiff's novel argument is misplaced. In any event, Plaintiffs have not shown a likelihood of success on the merits.

**B.     The School District's Content-Based Restriction Is Constitutional.**

Plaintiffs also argue that the School District's policies which prohibit cyberbullying that causes a substantial disruption constitutes unconstitutional

viewpoint discrimination. (Motion for TRO at PgID 72-73). In other words, Plaintiffs claim that the School District lacks the authority to punish students for their racist viewpoints.

Plaintiffs misclassify the School District's policies as viewpoint discrimination. The Sixth Circuit held that a school's ban on disruptive speech does not constitute viewpoint discrimination. *Barr v. Lafon*, 538 F.3d 554, 572 (6th Cir. 2008). Instead, the Sixth Circuit found that such a ban constituted a content-based restriction. *Id.*; *see also R.A. V. v. City of St. Paul*, 505 U.S. 377, 391 (1992)(holding that a blanket ban on the use of "odious racial epithets" by "proponents of all views" constitutes content-based regulation)).

A content-based speech restriction must satisfy strict scrutiny and is permissible if it is narrowly tailored to promote a compelling governmental interest. *U.S. v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 813 (2000). In the school context, content-based anti-harassment policies are constitutional because a school has a legitimate interest in preventing potentially disruptive student conduct from interfering with the educational process. *West v. Derby Unifies School Dist. No. 260*, 206 F.3d 1358, 1365 (10th Cir. 2000).

Here, the School District's policies prohibiting cyberbullying are narrowly tailored to promote the school's compelling interest in preventing a substantial

disruption. Therefore, Plaintiffs' content-based discrimination claim is unlikely to succeed.

### C.   The School District's Policies Comply With The Matt Epling Safe School Law.

Plaintiffs claim that the School District has no authority to regulate their speech under the Michigan Matt Epling Safe School Law, MCL 380.1310b. (Motion for TRO at PgID 74-75). Plaintiffs are wrong. The Michigan anti-bullying laws codified cyberbullying into its definition of "bullying" when such cyberbullying substantially interferes with educational opportunities, benefits, or programs of one or more students. *See* MCL 380.1310b(10)(c); *see* MCL 380.1210b(5)(a). In fact, Michigan law requires school districts to implement an anti-harassment policy that includes cyberbullying as a form of bullying. *See* MCL 380.1210b(5)(a). Therefore, the School District was expressly authorized and even required to regulate Plaintiffs' speech under Michigan law. Accordingly, this argument does not support a finding that Plaintiffs are likely to succeed on the merits.

### D.   The School District's Policies Are Not Unconstitutionally Vague or Overbroad.

Plaintiffs claim that the School District's policies and procedures are unconstitutionally vague and overbroad. (Motion for TRO at PgID 76). This claim is meritless.

The First Amendment vagueness test require a court to review the language of the challenged policy or regulation for unconstitutional ambiguity. A policy will survive the vagueness challenge if it "sets out [the proposed conduct] in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with, without sacrifice to the public interest." *U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers*, 413 U.S. 548, 579 (1973). "For public elementary and secondary school disciplinary rules, the language . . . [must be] specific enough to give fair notice to the students and to provide school officials with standards by which to enforce the policy." *Id.* at 267.

The Supreme Court has concluded that in the context of First Amendment challenges the overbreadth doctrine is strong medicine and should be employed with hesitation and only as a last resort. *L.A. Police Dep't v. United Reporting Publ'g Corp.*, 528 U.S. 32, 39 (1999). As such, a regulation or policy will not be susceptible to a facial overbreadth challenge "unless the overbreadth is 'substantial in relation to [its] plainly legitimate sweep.'" *Sypniewski v. Warren Hills Reg'l Bd. of Educ.*, 307 F.3d 243, 258 (3rd Cir. 2002)(quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973)). A regulation of speech is invalidated as overbroad "if no reasonable limiting construction is available that would render the policy constitutional." *Id.* Thus, a policy is not unconstitutional if the relatively broad language in the policy at issue can reasonably be viewed to avoid any overbreadth problem. *Id.*

24

Although vagueness and overbreadth are analytically distinct, the doctrines are often conceived as "'alternative and often overlapping' theories for relief on the same claim." *Ctr. For Individual Freedom v. Madigan*, 697 F.3d 464, 479 (7th Cir. 2012). For both vagueness and overbreadth questions a court must first determine whether the policy or policies at issue reach a substantial amount of constitutionally protected conduct. *Id.* (citing *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 (1982)).

Here, the School District's Bullying Policy, (Board Policy 5517.01), clearly and unambiguously only applies to unprotected speech. The policy defines harassment at "any act which subjects an individual or group to unwanted, abusive behavior." (**Exhibit F**). This prohibition extends to written abuse "which causes or threatens to cause . . . personal degradation." (*Id*). This policy applies to conduct which occurs at school and outside of school **if it interferes with the school environment. (*Id*).** The policy also defines bullying to include cyberbullying**. (*Id*).** Bullying is then defined as a written, verbal or physical act that is intended or a reasonable person would likely know is likely to harm one or more student directly or indirectly by: **"(A) substantially interfering with educational opportunities, benefits, or programs of one or more student[.]"** (*Id*). This policy not only substantially conforms to the requirements under MCL 380.1210b(5)(a), it also mirrors *Tinker. See Tinker*, 393 U.S. at 513-514 (holding that school officials may

restrict student expression if the student expression would "materially and substantially disrupt the work and discipline of the school."). Meaning, the policy only authorizes the School District to discipline students for cyberbullying that caused a substantial disruption. Therefore, the School District's Bullying Policy does not reach a substantial amount of constitutionally protected conduct. Accordingly, Plaintiffs are not likely to succeed on the merits of their vagueness and overbreadth claim.

### 3.    PLAINTIFFS WILL NOT SUFFER IRREPARABLE HARM.

An irreparable harm is an injury that is neither remote nor speculative but is actual and imminent. *Forest City Daly Housing, Inc., v. Town of N. Hempstead*, 175 F.3d 144, 153 (2nd Cir. 1999). Moreover, an irreparable harm is one that cannot be remedied by monetary damages. *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992). Where there is an adequate remedy at law, a preliminary injunction is not appropriate. *Modern Computer Sys., Inc. v. Modern Banking Sys., Inc.*, 897 F.2d 734, 738 (8th Cir. 1989).

The assertion of First Amendment rights does not automatically require a finding of irreparable injury, contrary to Plaintiffs' suggestion. *Hohe v Casey*, 868 F.2d 69, 73 (3rd Cir.), cert. denied, 493 U.S. 848 (1989). The plaintiff must show that there is a "chilling effect on free expression." *Id.*   Irreparable injury is only

established where money damages are difficult to ascertain or clearly inadequate. *See Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992).

Exclusion from participation in extracurricular activities does not constitute an irreparable harm. *Ottaviano ex. Rel Ottaviano v. Kings Park Cent. School Dist.*, __F. Supp. 2d __, 2010 WL 5437220, (E.D.N.Y. Dec. 23, 2010); *see Doninger v. Niehoff*, 514 F. Supp. 2d 199, 211 (D. Conn. 2007), aff'd 527 F.3d 41 (2nd Cir. 2008); *see S.J.W. ex rel. Wilson v. Lee's Summit R-7 School Dist.*, 696 F.3d 771, 779 (8th Cir. 2012)(holding that the student's claimed harm of his inability to try out for the band during his suspension which might jeopardize his music career, was too speculative to support a preliminary injunction)).

## A.   Plaintiffs A and B Will Not Suffer Irreparable Harm.

Plaintiffs A and B argue that they will suffer irreparable harm because they are barred from participating in extracurricular activities. (Motion for TRO at PgID 79). This argument fails to show an irreparable injury. As explained above, a denial of participation in extracurricular activities does not constitute an irreparable harm. Moreover, A and B may resume extracurricular activities on Monday, March 9, 2020. Thus, exclusion from extracurricular activities for a finite period time is insufficient to support a finding of irreparable harm. S*ee Olu-Cole v. E.L. Haynes Public Charter School*, 292 F. Supp. 3d 413, 420 (D.D.C. 2018), *rev'd on other grounds*, 930 F.3d 519 (C.A.D.C. 2019). Furthermore, Plaintiff B fails to elaborate

how exclusion from Swim and Dive competitions will cause him harm. Speculative harm is insufficient to support a preliminary injunction. *Wilson*, 696 F.3d at 779. As such, neither Plaintiff A nor Plaintiff B can show an irreparable injury. Accordingly, this Court should not grant a TRO/preliminary injunction for Plaintiffs A and B.

### B.   Plaintiffs C and D Will Not Suffer Irreparable Harm.

Plaintiffs C and D argue that they will suffer irreparable harm because they are unable to attend classes during their suspension. (Motion for TRO at PgID 79). This is not true.

While not clear from Plaintiffs' Motion or Complaint, while on suspension (that ends on March 6), <u>C & D have been allowed to complete their coursework and will take their final exams at the end of the trimester</u>. As such, there has been no academic consequence and they are still on track to matriculate with their peers. (**Exhibit I**). Next Trimester, C and D will not be suspended. C and D will attend an alternative education setting for the remainder of the school year. (*Id*).

Placing a student in an alternative education program evidences an attempt to educate the student within the district and does not constitute an irreparable harm. *See Taylor v. Corinth Public School Distric*t, 917 F. Supp. 464, 468 (N.D. Miss. 1996)(holding that the student did not suffer irreparable harm when the school placed the student in an alternative education program within the district.)). This is because an alternative education program provides students with sufficient resources

to complete their regularly assigned work and receive additional aid if that student requires it. *See S.B. ex rel. Brown v. Ballard County Bd. of Educ.*, 780 F. Supp. 2d 560, 569 (W.D. Ky. 2011)(citing *Lowery v. Euverard*, 497 F.3d 584, 588 (6th Cir. 2007)). Thus, placement in the alternative education program alone is insufficient to show irreparable harm. Because Plaintiffs offered no evidence that Plaintiffs C and D suffered *any* harm as a result of their discipline, a TRO/preliminary injunction is improper.

## 4.    AN INJUNCTION WOULD IRREPARABLY HARM THE SCHOOL DISTRICT AND ITS STUDENTS; IT WOULD ALSO VIOLATE PUBLIC POLICY

School officials have an affirmative duty to not only ameliorate the harmful effects of disruptions, but to prevent them from happening in the first place. Cyber bullying and harassment—and their negative consequences—are issues of great societal import. Both impact the ability of students to attend school and learn.

According to the National Institute for Mental Health, suicide is the second leading cause of death for teenagers.[11] One of the leading causes of teenage suicide is peer-on-peer bullying. The National Center for Educational Statistics reports that more than 40% of teenagers were bullied in the preceding year, and more than 20% of high school students reported being bullied online. Plaintiffs' present Motion

---

[11] https://www.nimh.nih.gov/health/statistics/suicide.shtml

seeks to immunize bullies for extreme and outrageous conduct that impacts other students' ability to attend school and learn.

*Tinker* supports the conclusion that public schools have a "compelling interest in regulating speech that interferes with or disrupts the work and discipline of the school, including discipline for student harassment and bullying." *Kowalski v. Berkeley County Schools*, 652 F.3d 565, 572 (4th Cir. 2011), citing *DeJohn v. Temple Univ.*, 537 F.3d 301, 319-20 (3rd Cir. 2008). As noted by the *Kowalski* court,

> … student-on-student bullying is a "major concern" in schools across the county and can cause victims to become depressed and anxious, to be afraid to go to school, and to have thoughts of suicide. *See* Stop-Bullying.gov, available at www.stopbullying.gov []. Just as schools have a responsibility to provide a safe environment for students free from messages advocating illegal drug use [citation omitted] …, schools have a duty to protect their students from harassment and bullying in the school environment [citation omitted] … Far from being a situation where school authorities "suppress speech on political and social issues based on disagreement with the viewpoint expressed," [citation omitted] school administrators must be able to prevent and punish harassment and bullying in order to provide a safe school environment conducive to learning.

652 F.3d at 572. *See also Lowery v. Euverard*, 497 F.3d 584, 596 (6th Cir. 2007).

The Supreme Court "has repeatedly emphasized that need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." *Tinker*, 393 U.S. at 507. "Without first establishing discipline and maintaining order, teachers cannot begin to educate their students." *New Jersey v.*

*T.L.O.*, 469 U.S. 325, 350 (1985) (Powell, J., concurring).  The Supreme Court has cautioned that it is "improper for courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Endrew F ex rel Joseph F v Douglas Co Sch Dist RE-1*, 137 S Ct 988, 1001; 197 L Ed 2d 335 (2017). The *Endrew F* Court explained that this deference is because of the "expertise and the exercise of judgment by school authorities."

Nothing in the "Federal Constitution compels the teachers, parents, and elected school officials to surrender control of the American public-school system to public school students." *Fraser*, 478 U.S. at 686 (quoting *Tinker*, 393 U.S. at 526 (Black, J., dissenting.). "Unlike our system of government, the authority structure [in a school] is not bottom-up, but top-down. The authority of school officials does not depend on the consent of the students. To threaten this structure is to threaten the mission of the public-school system." *Lowery*, 497 F.3d at 588.

An injunction in this case would:

- cause students fear and apprehension knowing that the School District could do nothing to punish bullies and harassers;

- allow Students to subvert explicit rules and policies;

- allow severe and pervasive harassment;

- undermine the school's ability to teach character, communication, and social responsibility;

31

- create discord among members of the student body; and

- tacitly condone racism.

In this case, the School District's investigation into the incident revealed the severity of the situation. (**Exhibit C**). African American students were afraid to attend class and could not focus on their coursework. (*Id*). The School Officials were forced to respond quickly and decisively, in order to remedy the substantial disruption and prevent a racially hostile environment. This type of response can only be accomplished if schools are able to discipline students in accordance with school policies, without fear that a court will substitute its will for their decisions. *See Brown*, 780 F. Supp. 3d at 570. Thus, Plaintiffs' requested TRO/ preliminary injunction is not in the public interest. As such, it should be denied.

## CONCLUSION

Racial harassment has no place in our public schools.  Schools are a place where students should feel safe. A student who fears going to school, or who cannot focus on coursework due to harassment, cannot receive a meaningful education. Plaintiffs' racist vitriol directed at classmates (1) impacted a community, and (2) harmed their fellow classmates. Their conduct was not protected by the constitution, and their request for a TRO should be denied.

/s/TIMOTHY J. MULLINS
GIARMARCO, MULLINS & HORTON, PC

DATED:  March 2, 2020        Attorney for Defendants

## <u>CERTIFICATE OF ELECTRONIC SERVICE</u>

TIMOTHY J. MULLINS states that on March 2, 2020, he did serve a copy of

his **Response to Plaintiffs' Motion for a Temporary Restraining Order of**

**Appearance** via the United States District Court electronic transmission.

/s/TIMOTHY J. MULLINS
GIARMARCO, MULLINS & HORTON, PC
Attorney for Defendants
101 W. Big Beaver Road, 10th Floor
Troy, MI 48084-5280
(248) 457-7020
tmullins@gmhlaw.com
P28021
